**AFRICAN TRADE & INFORMATION CENTER, INC., Mohamoud D. Ahmed, and Alan W. Gates, Plaintiffs-Appellees,**

**v.**

**James F. ABROMAITIS, Defendant-Appellant.**

**Docket No. 01-7303.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 2, 2002.

Decided: May 23, 2002.

Mark F. Kohler (Karla A. Turekian, on the brief), Assistant Attorneys General; Richard Blumenthal, Attorney General, Hartford, CT, on behalf of Defendant–Appellant James F. Abromaitis.

John R. Williams, Williams & Pattis, New Haven, CT, on behalf of Plaintiff–Appellees African Trade & Information Center, Inc., Mohamoud D. Ahmed, and Alan W. Gates.

Before: KATZMANN and NEWMAN, Circuit Judges, and GLEESON, District Judge.[1]

Judge KATZMANN concurs by separate opinion.

GLEESON, United States District Judge.

This appeal concerns the availability of a qualified immunity defense for defendant James F. Abromaitis, the Commissioner of the Connecticut Department of Economic and Community Development ("DECD"), who allegedly violated the constitutional rights of plaintiffs African Trade & Information Center, Inc., Mohamoud D. Ahmed, and Alan W. Gates by retaliating against them for exercising their free speech rights and by denying them equal protection of the laws. Plaintiffs allege that Abromaitis violated these rights when he refused to consider their application to serve as Connecticut's trade representatives to countries on the continent of Africa. That refusal, according to plaintiffs, was intended to punish them for speaking out against Abromaitis.

Abromaitis brings this interlocutory appeal from the February 2, 2001, order of the United States District Court for the District of Connecticut (Stefan R. Underhill, *District Judge*) denying his motion for summary judgment on the ground of qualified immunity. For the reasons discussed below, we uphold Abromaitis's claim of qualified immunity on both the free speech and equal protection claims. We therefore reverse and remand with directions to dismiss the complaint to the extent it seeks compensatory and punitive damages from Abromaitis.

BACKGROUND

Viewed in the light most favorable to the plaintiffs, the facts alleged by the plaintiffs, which we accept only for purposes of this appeal, are set forth below.

Plaintiffs are international marketing specialists with particular expertise in Africa and the Middle East. In 1997, largely as a result of their efforts, the Connecticut General Assembly passed, and the Governor of Connecticut signed into law, Public Act 97–135, for the purpose of developing trade relations between Connecticut and

1. The Honorable John Gleeson of the United States District Court for the Eastern District of New York, sitting by designation.

countries on the continent of Africa.[2] Abromaitis opposed this legislation at the time it was being considered by the Connecticut legislature.

Abromaitis subsequently became Commissioner of the DECD, and in that capacity he and his staff sought to undermine the effective implementation of the African trade statute. In response, plaintiffs publicly "exposed and opposed" Abromaitis and his staff. *See* Complaint ("Compl."), ¶ 9. Plaintiffs' actions took the form of "public communications and ... communications to public officials within the State of Connecticut." *Id.* These communications included a meeting on July 16, 1998, with Abromaitis and a member of his staff, at which plaintiffs criticized the DECD's inaction.

Because of their expertise in matters of African trade, plaintiffs sought to be appointed by Abromaitis as Connecticut's trade representative to African countries. However, in early September 1998, Abromaitis entered into personal service agreements with the Connecticut World Trade Association ("CWTA") and Equator, U.S.A., Inc. ("Equator"), to act as Connecticut's trade representatives to such countries. Abromaitis never gave serious consideration to plaintiffs' application. Rather, to punish them for engaging in protected speech,[3] he sought a waiver of Connecticut's competitive bidding process and rejected their application, despite his knowledge that they were far better qualified for the position than CWTA and Equator. By doing so, plaintiffs allege, Abromaitis violated their free speech rights guaranteed by the First Amendment and denied them a fair and equal opportunity to compete for the position, in violation of the Equal Protection Clause of the Fourteenth Amendment.

The complaint was filed on April 19, 1999. Abromaitis moved for summary judgment on the ground of qualified immunity. By order entered on February 2, 2001, the district court denied the motion. With respect to the equal protection claim, the court concluded that plaintiffs had come forward with sufficient evidence to permit a jury to conclude that Abromaitis failed to consider plaintiffs' application "on an equal footing with the others who sought the contracts," and that he acted with "discriminatory intent" to retaliate against plaintiffs because of their speech. *See* Ruling on Defendant's Motion for Summary Judgment, *African Trade & Info. Ctr., Inc. v. Abromaitis,* 99 CV 6028(SRU) (D.Conn. Feb. 1, 2001), at 3. With respect to the First Amendment claim, the district court rejected Abromaitis's defense of qualified immunity. The fact that plaintiffs had no preexisting commercial relationship with the government

2. Public Act 97–135 added the following provision to Conn. Gen.Stat. § 32–501:

> (b) The commissioner [of the DECD] may give priority in [international trade] programs to promoting and assisting Connecticut businesses with regard to trade with African countries with whom the United States has diplomatic relations....

3. The record reveals two related but nevertheless different versions of why Abromaitis retaliated against plaintiffs. The complaint alleges retaliation for the criticism of Abromaitis and his staff after he took office. *See* Compl., ¶ 13–14. Plaintiffs' Local Rule 9(C)(2) statement contends that Abromaitis "retaliate[d] against them for their role in persuading the Connecticut General Assembly to adopt the legislation." On appeal, plaintiffs' contention is consistent with the complaint. *See* Brief for Appellees at 19 (retaliation triggered by plaintiffs' "protected criticism of [Abromaitis's] allegedly half-hearted implementation of the state legislatures African Trade Initiative"). Since both versions allege retaliation against plaintiffs for engaging in speech on matters of public concern, the difference between them is not relevant to our decision.

did not, the court held, affect their right not to be subject to retaliation based on speech.

On March 1, 2001, Abromaitis filed the instant interlocutory appeal from the district court's ruling.

DISCUSSION

A. *Appellate Jurisdiction*

Plaintiffs contend that we do not have jurisdiction to hear this appeal. We disagree.

"Ordinarily, an appeal lies only from a final judgment of a district court, since federal law limits appellate jurisdiction to review of 'final decisions' of that court." *Locurto v. Safir,* 264 F.3d 154, 162 (2d Cir.2001) (citing 28 U.S.C. § 1291 (1994)). However, a public official's qualified immunity is not merely a shield against liability; it is also a right not to be forced to litigate the consequences of official conduct. *See Mitchell v. Forsyth,* 472 U.S. 511, 525–30, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The improper denial of that right is effectively unreviewable on appeal from a final judgment, because the right is lost if the case is erroneously allowed to proceed to trial. *See id.* at 526–27, 105 S.Ct. 2806. Accordingly, under the collateral order doctrine, a denial of a claim of qualified immunity is immediately appealable to the extent it turns on an issue of law. *See id.* at 528–29, 105 S.Ct. 2806; *see also Locurto,* 264 F.3d at 162.

This appeal turns solely on issues of law. Abromaitis concedes, for the purposes of the appeal, the truth of plaintiffs' allegations, and contends only that the conduct alleged did not violate a clearly established constitutional right. In such circumstances, an interlocutory appeal from an order denying qualified immunity is permitted. *See, e.g., Munafo v. Metro. Transp. Auth.,* 285 F.3d 201, 211 (2d Cir. 2002).

B. *The Merits*

1. *The First Amendment Claim*

The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The "better approach to resolving" such claims is to first determine whether the plaintiffs have alleged a violation of a constitutional right, and then, if they have, to determine whether the right was clearly established at the time of the alleged violation. *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). However, this approach is not mandatory. We may, in an appropriate case, decline to rule on the question whether an asserted right exists where, as here, we conclude that it was not clearly established at the relevant time. *See Horne v. Coughlin,* 178 F.3d 603, 606–07 (2d Cir.1999).

This is such a case. As discussed below, it squarely raises an issue that was expressly reserved by the Supreme Court in *Board of County Commissioners v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996): whether applicants for new government contracts who have no pre-existing commercial relationship with the government are protected by the First Amendment from retaliation based on speech. However, the merits of this issue are scarcely mentioned in the briefs on appeal, let alone adequately briefed. Plaintiffs' brief, which devotes barely more than a page to the issue, simply assumes the point, and cites none of the various Supreme Court decisions on which the

right they assert would be based. This cursory briefing would make it "all the more perilous" for us to render an advisory opinion on the issue. *See Horne,* 178 F.3d at 606. Moreover, the issue is not likely to evade judicial review if we do not address it now. *See id.* (declining to decide whether asserted right exists where there was no reason to believe that the issue "will repeatedly, or over a substantial time, escape judicial review by reason of qualified immunity."). Indeed, if standing objections can be met, the issue might be addressed in this very case on remand, as plaintiffs seek injunctive relief as well, and qualified immunity is not a defense when such relief is sought. *See id.* Accordingly, we think the more prudent approach in the circumstances of this case is to refrain from deciding whether the asserted right exists.

Three factors are considered in evaluating whether a right was clearly established at the time a § 1983 defendant acted: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Shechter v. Comptroller of New York,* 79 F.3d 265, 271 (2d Cir. 1996) (citing *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989)).

The "chronic difficulty" of articulating the right at issue with the appropriate specificity, *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998), does not afflict this case, as it has been articulated for us by the Supreme Court in *Umbehr.* For many years before *Umbehr,* the Court had "consistently held that while the government enjoys significantly greater latitude when it acts in its capacity as an employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." *Locurto,* 264 F.3d at 166.[4] In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court addressed whether a government worker whose political affiliation is not a job qualification was constitutionally protected from dismissal based on his affiliation with a particular party, answering it in the affirmative. *See id.* at 519, 100 S.Ct. 1287. In *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the Court expanded that rule by endorsing the right of *applicants* for public employment not to be rejected based on political affiliation. *See id.* at 79, 110 S.Ct. 2729. *Umbehr* addressed and answered yet another question—whether the protections enjoyed by government employees against termination based on protected speech should be extended to the termination of contracts with independent contractors who do business with the government. *See* 518 U.S. at 673, 116 S.Ct. 2342. The Supreme Court held that it should, *id.* at 684–85, 116 S.Ct. 2342, and in a case decided the same day it also extended to such independent contractors the protection against termination based on political affiliation that *Branti* had conferred on government employees. *See O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 715, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996).

In extending First Amendment protection to independent contractors with ongoing commercial relationships with the

4. The extent of the employees' protection is determined by balancing their free speech interests against the government's interests as employer. *See Pickering v. Board of Ed.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

government, *Umbehr* expressly reserved the question whether the right exists absent such a relationship. It did so with the following caveat, which anticipates the First Amendment claim in this case: "[W]e emphasize the limited nature of our decision today. Because Umbehr's suit concerns the termination of a pre-existing commercial relationship with the government, we need not address the possibility of suits by bidders or applicants for new government contracts who cannot rely on such a relationship." 518 U.S. at 685, 116 S.Ct. 2342. Thus, the question before us is whether, as of September 1998, a bidder or applicant for a new government contract who lacked a preexisting commercial relationship with the government had a clearly established right not to be denied the contract in retaliation for his or her protected speech.

Neither the Supreme Court nor this Court has yet addressed that question, and thus the right asserted by plaintiffs has not been established by decisions of those courts. This is not necessarily an insurmountable barrier to a finding that the right exists, as the Supreme Court has left open the possibility that a right may be "clearly established" by decisions of other lower courts. *See Harlow v. Fitzgerald,* 457 U.S. at 818 n. 32, 102 S.Ct. 2727 (citing *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978)). Although we have consistently held that our own decisions may support the existence of the right in question, as we recently observed in *Poe v. Leonard,* 282 F.3d 123 (2d Cir.2002), our decisions send conflicting signals as to whether the decisions of other circuits may do so as well. *See id.* at 141 n. 15 (citing cases). We need not resolve the issue in this case because the right has not been clearly established by any court.

The only circuit court of appeals that has addressed the question left open by *Umbehr* refused to extend First Amendment protection to contractors who do not have an ongoing relationship with the government. *See McClintock v. Eichelberger,* 169 F.3d 812, 817 (3d Cir.1999) (need for judiciary to avoid intrusion into government contract awards, and risk that such intrusion might discourage political activity, contribute to "a principled reason to limit *Umbehr* and *O'Hare* to situations in which ... the retaliatory act is the termination of an ongoing commercial relationship"). The district court discounted the significance of *McClintock,* asserting that it "expressly refused to address" the issue reserved by *Umbehr* and now before us. *See* Ruling on Defendant's Motion for Summary Judgment, *African Trade & Info. Ctr., Inc. v. Abromaitis,* 99 CV 6028(SRU) (D.Conn. Feb. 1, 2001), at 5. We disagree. While the Third Circuit indeed rejected McClintock's claim on a procedural ground as well, *see* 169 F.3d at 817, it obviously addressed—and rejected, as an alternative ground for its decision—the existence of the asserted right. We note that lower courts within the Third Circuit read *McClintock* as we do, and have followed it by dismissing § 1983 claims where plaintiffs did not have the requisite ongoing relationship with the government. *See Prisma Zona Exploratoria de Puerto Rico, Inc., v. Calderon,* 162 F.Supp.2d 1, 7–8 (D.P.R.2001); *Allstate Transp. Co. v. Southeastern Pennsylvania Transp. Auth.,* No. Civ. A 97–1482, 2000 WL 329015, at *20 (E.D.Pa. March 27, 2000); *Halstead v. Motorcycle Safety Found., Inc.,* 71 F.Supp.2d 464, 474 (E.D.Pa.1999). In any event, even if this aspect of *McClintock* were mere *dicta,* as the district court implied, the Third Circuit's rejection of the right asserted by plaintiffs here would weigh against their

claim that the right had been clearly established in 1998.

The limited treatment of the issue in the lower courts in this circuit also undermines plaintiffs' claim. As late as 2001, the existence of the right was identified as an open question in the circuit. *See Housing Works, Inc. v. Turner,* 179 F.Supp.2d 177, 198 (S.D.N.Y.2001) (noting that this Court has yet to address whether *Umbehr* may properly be extended to a contractor lacking a preexisting contractual relationship with the government, and reserving judgment on that issue because plaintiff had such a relationship). The only decision within the circuit that extends *Umbehr* to bidders with no preexisting relationship with the government is *A.F.C. Enterprises, Inc. v. New York City School Construction Authority,* No. 98 CV 4534, 2001 WL 1335010, (E.D.N.Y. Sept.6, 2001), which agrees with the dissent in *McClintock.* Even if a district court decision could "establish" a right for the purpose of the qualified immunity inquiry, *A.F.C. Enterprises* would not assist plaintiffs, as they must demonstrate that the right was clearly established in September 1998, three years before that case was decided.

The third factor to consider in determining whether a right is clearly established is whether, under preexisting law, a reasonable official in Abromaitis's position would have understood that his acts were unlawful. A right may be considered clearly established if the decisions of the Supreme Court or this court "clearly foreshadow" a ruling in plaintiff's favor. *See Shabazz v. Coughlin,* 852 F.2d 697, 701 (2d Cir.1988). We doubt that the existence of a constitutional right could ever be considered "clearly foreshadowed" where, as here, the Supreme Court has expressly reserved the issue for future decision and not a single circuit court of appeals had addressed it at the time the official acted. In any event, we conclude that a reasonable official in Abromaitis's position would not have understood from existing case law that it was unconstitutional to refuse to contract with plaintiffs because they had criticized his performance of his official duties.[5]

In sum, we have no doubt that the right asserted here by plaintiffs, if it exists at all, was not clearly established when Abromaitis engaged in the challenged conduct.

2. *The Equal Protection Claim*

Plaintiffs also assert that Abromaitis violated their Fourteenth Amendment rights by depriving them of equal protection of the laws. Abromaitis asserts that he is entitled to qualified immunity on this claim as well because it ultimately depends on the existence of the First Amendment right addressed above. We agree with Abromaitis.

The Equal Protection Clause requires the government to treat all similarly situated people alike. *See Harlen Assocs. v. Incorporated Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). As the Supreme Court has recently reaffirmed, equal protection claims can be brought by a "class of one"

5. We are aware of Justice Scalia's assertion that *Umbehr's* suggestion that a First Amendment line might be drawn between contractors with ongoing government relationships and contractors without them is "[n]ot likely; in fact, not even believable." *Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2361, 2373, 135 L.Ed.2d 843 (1996) (Scalia, J. dissenting). However, "Cassandra-like predictions in dissent are not a sure guide to the breadth of the majority's ruling," *United States v. Travers,* 514 F.2d 1171, 1174 (2d Cir.1974) (Friendly, J.).

where a plaintiff alleges that she has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) (citations omitted). In *Olech,* the plaintiff sought to connect her property to a municipal water supply, but the Village of Willowbrook (the "Village") conditioned its approval on her granting it a 33–foot easement, which was 18 feet longer than the easements required of other property owners seeking access to the water supply. *See id.* at 563, 120 S.Ct. 1073. Olech's equal protection claim alleged that the Village's demand was "irrational and wholly arbitrary," and was "motivated by ill will resulting from the Olechs' previous filing of an unrelated, successful lawsuit against the Village." *Id.* The Court held that Olech's allegations, even apart from the Village's subjective motivation, were sufficient to state a claim for relief under traditional equal protection analysis. *See id.* at 564–65, 120 S.Ct. 1073 (explaining that "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.") (citation omitted).

If plaintiffs had alleged that Abromaitis's refusal to contract with them on behalf of DECD was wholly arbitrary, or irrational, they would have alleged a violation of a clearly established constitutional right. The problem with plaintiffs' equal protection claim is that they make no such allegation. To the contrary, they allege a specific reason for the refusal that was entirely rational but, they claim, impermissible under the First Amendment. In short, plaintiffs' factual allegations throughout the case require the conclusion that their equal protection claim and their First Amendment claim coalesce, and that Abromaitis's qualified immunity on the latter entitles him to qualified immunity on the equal protection claim as well.

The first paragraph of the complaint reads as follows: "This is a suit to redress the deprivation by the defendant of rights secured to the plaintiffs by the constitution and laws of the United States. *The defendant has deprived the plaintiffs of equal protection of the laws to punish them for exercising rights protected by the First Amendment.*" Compl., ¶ 1 (emphasis supplied). Elsewhere in the complaint, plaintiffs specifically allege that Abromaitis's decision to deny them a fair and equal opportunity to compete for the position as trade representative was made to punish them for exercising their right to engage in free speech. *See* Compl., ¶ 13–14. At the conclusion of discovery, plaintiffs again asserted that the refusal to consider their application was motivated "by a desire to retaliate against them for their role in persuading the Connecticut General Assembly to adopt the legislation." Plaintiffs' Local Rule 9(C)(2) Statement.

In ruling on the motion for summary judgment, the district made clear that the equal protection claim was inextricably linked to the alleged First Amendment violation. *See* Ruling on Defendant's Motion for Summary Judgment, *African Trade & Info. Ctr., Inc. v. Abromaitis,* 99 CV 6028(SRU) (D.Conn. Feb. 1, 2001), at 2. ("In this case, the plaintiffs allege that Abromaitis treated them differently from the applicants who were awarded the personal service contracts in order to punish the plaintiffs for engaging in speech critical of Abromaitis.") Indeed, as noted above, the district court denied summary judgment on the equal protection claim because plaintiffs had come forth with suf-

ficient evidence to prove that Abromaitis's unequal treatment of their application was based on his intent to retaliate against them for their criticism of him.

To prevail under *Olech,* on which they rely heavily, plaintiffs need to allege that they were "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech,* 528 U.S. at 564, 120 S.Ct. 1073. As set forth above, they have alleged instead that Abromaitis did not consider them for their desired positions because they had publicly criticized his conduct in office. Taking that allegation as true, we cannot characterize Abromaitis's actions as irrational. Rather, plaintiffs' equal protection claim depends entirely on their contention that Abromaitis's action were *impermissible.* Because, as discussed above, that was by no means clear, Abromaitis was entitled to summary judgment on the basis of qualified immunity.

CONCLUSION

For the foregoing reasons, we reverse the order of the district court and remand with directions to dismiss the complaint to the extent it seeks compensatory and punitive damages.

KATZMANN, Circuit Judge, concurring:

I concur in most respects with the thoughtful majority opinion but write separately to explain that it is not the absence of a decision by this court that leads me to conclude that the plaintiff's First Amendment claims must be dismissed on qualified immunity grounds. The decisive factor for me was the Supreme Court's particular emphasis in *Board of County Commissioners v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) that it was not considering whether the First Amendment right against retaliation protects contractors bidding for a state contract. Absent this language, I would have concluded that such a right was clearly established because its contours are foreshadowed by prior Supreme Court decisions. *See, e.g., Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("[W]e need only determine whether pre-existing law sufficiently foreshadows the direction it will take such that government officials have reasonable notice of the illegality of their actions.").

While this Circuit has not explicitly extended First Amendment protection to contractors who are bidding for a contract, logic and Supreme Court precedent strongly suggest that the state may not retaliate against such contractors for speaking out on issues of public concern. Independent contractors applying for a contract are in a similar situation to applicants for government employment who are clearly protected by the First Amendment.[1] In the public employment context, the state "may not deny a benefit [such as public employment] to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. . . . regardless of the public employee's contractual or other claim to a job." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Thus, conditioning hiring decisions for government positions based on an applicant's political beliefs violates the First Amendment. *See, e.g., Rutan v. Republican Party of Illinois,* 497 U.S. 62, 78, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) ("Under our

1. In *Umbehr,* the Supreme Court noted that it generally looks to its First Amendment cases involving government employees for guidance in First Amendment cases involving independent contractors. *Id.* at 674, 116 S.Ct. 2342.

sustained precedent, conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so.") (citations omitted).

It would be anomalous to have a system where applicants for government jobs are protected by the First Amendment while applicants for government contracts are not. The Supreme Court has generally agreed with this common sense proposition and has acknowledged that there is no reason that a First Amendment retaliation claim "should turn on the distinction" between government employees and independent contractors. *O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 722, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996).

An argument could be made that First Amendment protection should not apply to contractors such as the plaintiffs because the government has a greater need for flexibility in its decisionmaking when it awards contracts than when it hires permanent employees. But it could also be contended that the need for flexibility is greater with respect to employment decisions. The government arguably takes on a greater commitment when it hires an employee with an indefinite tenure than when it hires a contractor whose tenure only lasts as long as the contract. Moreover, the Supreme Court has generally rejected the view that First Amendment suits would place an undue burden on the government's ability to contract. *See O'Hare,* 518 U.S. at 725, 116 S.Ct. 2353 ("In view of the large number of legitimate reasons why a contracting decision might be made, fending off baseless First Amendment lawsuits should not consume scarce government resources.").

The facts of this case illustrate the difficulty of drawing a distinction between independent contractors and government employees. The plaintiffs sought to be Connecticut's trade representative to African countries. While technically an independent contractor position, in substance, this position may not be substantially different from an employment opportunity with the state. In this circumstance, it is difficult to fathom why the First Amendment would allow a state official to retaliate against the plaintiffs for speaking out on a matter of public concern because the job is technically an independent contract when it is clear that such retaliation would be impermissible under the First Amendment if the job entailed an employment contract. I do not think that the First Amendment supports such a fine distinction.