Anne RAPKIN, Plaintiff,

v.

Arthur J. ROCQUE, in his individual and official capacities, Sidney J. Holbrook, in his individual and official capacities, and Jane K. Stahl, in her individual and official capacities, Defendants.

No. 3:99CV1928 (GLG).

United States District Court, D. Connecticut.

Oct. 22, 2002.

Daniel E. Livingston, Ruth L. Pulda, Livingston, Adler, Pulda, Meiklejohn & Kelly, Hartford, CT, for plaintiff.

Carla R. Walworth, Mary C. Dollarhide, Sarah Elizabeth Graves, Joshua D. Goodman, Peter M. Schultz, Yolanda Seals–Coffield, Paul, Hastings, Janofsky & Walker, Stamford, CT, for defendants.

Ralph G. Elliot, Tyler Cooper & Alcorn, Hartford, CT, for movant.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GOETTEL, District Judge.

Plaintiff, who for many years was the chief legal counsel[1] for the State of Connecticut Department of Environmental Protection ("DEP"), complains that Defendants subjected her to adverse employment actions and eventually terminated her in violation of her First Amendment right of freedom of speech and her right to seek judicial redress without retaliation. Her complaint is brought pursuant to 42 U.S.C. § 1983 and seeks both monetary and injunctive relief.

Pending before the Court is Defendants' motion for summary judgment [Doc. # 100] addressed to the two remaining counts of Plaintiff's First Amended Complaint.[2] Because the Court finds genuine issues of material fact as to Defendants' motivation in the adverse employment actions taken against Plaintiff, we hold that Defendants are not entitled to summary judgment on their qualified immunity defense. In all other respects, the motion for summary judgment will be denied without prejudice to renewal after the completion of discovery.

### Background

Defendants have raised four main arguments in support of their motion for summary judgment. First, they claim that Plaintiff's section 1983 claim fails as a matter of law because she does not have a cognizable First Amendment right, her speech was not on a matter of public concern, and because the balancing test prescribed by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), weighs in favor of Defendants. Second, with respect to Plaintiff's claims against them in their individual capacities, they argue that they are protected by qualified immunity. Third, they assert that Plaintiff's complaint should be dismissed because it is, in reality, a political affiliation claim, and she was in a confidential position within the DEP. Finally, they argue that all of Plaintiff's claims against former Commissioner Holbrook and all claims pertaining to acts of the Defendants prior to September 30, 1996, are barred by the three-year statute of limitations applicable to section 1983 cases.

---

1. The official title for this position was "Legislative and Administrative Manager," which was part of the classified service.

2. The supplemental state-law claims originally asserted by Plaintiff were dismissed by this Court in its ruling on Defendants' Motion to Dismiss, entered on May 15, 2000. Additionally, the Court dismissed all claims against

Defendants in their official capacities except those seeking prospective injunctive relief. Since Plaintiff is no longer employed with the DEP, it is not clear that she is still interested in prospective injunctive relief. However, that issue does not need to be addressed at this time.

In response to Defendants' Motion for Summary Judgment, Plaintiff filed a motion for discovery pursuant to Rule 56(f), Fed.R.Civ.P. In denying that motion (without prejudice to later renewal), this Court held that the potentially dispositive qualified immunity defense should be resolved first before subjecting government officials to further discovery. Therefore, the hearing on Defendants' motion for summary judgment was limited to a consideration of the issue of qualified immunity.

### Summary Judgment Standard

The standard for reviewing summary judgment motions is well-established. A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The burden of establishing that there is no genuine factual dispute rests with the moving party. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir.1994). In ruling on a motion for summary judgment, the Court must resolve all ambiguities and draw all reasonable inferences in favor of plaintiff, as the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

 As noted, our consideration of Defendants' summary judgment motion is limited to their qualified immunity defense, an affirmative defense as to which the burden rests with the Defendants. *See Gomez v. Toledo*, 446 U.S. 635, 639–41, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The Supreme Court has endorsed the use of summary judgment in section 1983 cases where the defense of qualified immunity has been raised "to weed out truly insubstantial lawsuits prior to trial." *Crawford–El v. Britton*, 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). "[I]f the defendant-official has made a properly supported motion, the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Id.* (citing *Liberty Lobby*, 477 U.S. at 256–57, 106 S.Ct. 2505). This is in keeping with the "strong public interest in protecting public officials from the costs associated with the defense of damages actions," which is best served by permitting "insubstantial lawsuits to be quickly terminated." *Id.* at 590, 118 S.Ct. 1584. The entitlement to qualified immunity is an *"immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis in original); *see also African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 359 (2d Cir.2002) (holding that "a public official's qualified immunity is not merely a shield against liability; it is also a right not to be forced to litigate the consequences of official conduct").

### The Qualified Immunity Doctrine

 Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The courts have held that there are three circumstances under which a government official, sued in his individual capacity, is entitled to qualified immunity:

> (1) if the conduct attributed to him was not prohibited by federal law; ... or (2) where the conduct was so prohibited, if the plaintiff's right not be subjected to such conduct by the defendant was not clearly established at the time it occurred; ... or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

*Munafo v. Metropolitan Transp. Auth.*, 285 F.3d 201, 210 (2d Cir.2002) (internal quotations and citations omitted). The "better approach" to resolving such claims is to first determine whether the plaintiff has alleged a violation of a constitutional right and, if so, to determine whether the right was clearly established at the time of the alleged violation. *African Trade & Info. Ctr.*, 294 F.3d at 359. This approach, however, is not mandatory. *Id.*

In this case, because discovery is not complete, we do not reach the merits of Plaintiff's constitutional claims. Plaintiff's complaint has presented a cognizable First Amendment claim and, therefore, within the framework of those allegations, we consider Defendants' qualified immunity defense. *See Munafo*, 285 F.3d at 210.

### Plaintiff's First Amendment Retaliation Claims

Plaintiff alleges in her complaint that the employment actions taken by the Defendants were motivated in whole or in part by animus against the Plaintiff because of her exercise of her rights to Free Speech, including her rights and obligations to give honest and accurate legal advice to the agency and her rights and obligations to perform her duties in compliance with state and federal laws.

(Pl.'s Am. Comp. ¶ 21.) She further alleges that their actions "were motivated in whole or in part by animus against the Plaintiff because she threatened to take legal action if they continued to deprive her of her constitutional rights and were in retaliation for her invoking her right to seek such redress." (Pl.'s Am. Comp. ¶ 27.)

██ As the Second Circuit discussed in its recent decision, *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir.2001), although the "government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." An "employee's right to be free from such retaliation has been clearly established since at least 1968." *Munafo*, 285 F.3d at 211 (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

██ To make out a First Amendment claim for a governmental employer's retaliation against an employee for exercising his or her right of free speech, a plaintiff must establish that what he or she said or did constituted speech on a matter of public concern[3] *and* that his or her speech was a motivating factor in the adverse

---

**3.** As the Supreme Court held in *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."

action taken by the employer. *Locurto*, 264 F.3d at 166. Once a plaintiff makes such a showing, the government may nonetheless escape liability based upon either of two rationales: (1) that the plaintiff's speech would disrupt the government's activities and that such disruption is sufficient to outweigh the First Amendment value of the plaintiff's speech; or (2) that it would have taken the same adverse action in the absence of the protected speech. *Id.; see also Lewis v. Cowen*, 165 F.3d 154, 162–63 (2d Cir.), *cert. denied*, 528 U.S. 823, 120 S.Ct. 70, 145 L.Ed.2d 60 (1999).

▇▇▇▇ The first rationale, commonly referred to as "the *Pickering* balancing test," is necessitated by the State's dual role as sovereign and employer. *Lewis*, 165 F.3d at 161. As sovereign, the State's ability to regulate free speech is severely curtailed by the First Amendment, "which protects the free and open discourse concerning public affairs." *Id.* Yet, as an employer charged with providing essential public services, the State has greater leeway to control employees' speech that threatens to undermine its ability to perform critical public functions. *Id.* "The 'manner, time, and place' in which the speech occurs is important in determining whether it is protected." *Id.* at 162 (quoting *Connick*, 461 U.S. at 152, 103 S.Ct. 1684). Furthermore, the *Pickering* bal-

ancing test is affected by the nature of the employee's responsibilities. "The more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir.1997) (internal quotations omitted). Thus, a government employer may fire an employee for speaking out on a matter of public concern because of the disruptiveness of the speech, if the employer's prediction of disruption is reasonable; the potential disruptiveness outweighs the value of the speech; and the employer took action against the employee based on this disruption and *not* in retaliation for the speech. *Locurto*, 264 F.3d at 166. Thus, even if the potential disruptiveness of the employee's speech outweighs the value of that speech, the employee may still prevail by demonstrating that the employer disciplined him or her in retaliation for his or her protected speech rather than out of fear of any disruption that the speech might reasonably cause. *Lewis*, 165 F.3d at 163; *see also Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir.1996).

How this subjective intent standard impacts a qualified immunity defense, particularly in the context of a summary judgment motion, becomes more problematic.[4]

4. In *Crawford–El*, one of the issues on which the Supreme Court granted certiorari was:

> In a First Amendment retaliation case against a government official, is the official entitled to qualified immunity if she asserts a legitimate justification for her allegedly retaliatory act and that justification would have been a reasonable basis for the act, even if evidence—no matter how strong—shows the official's actual reason for the act was unconstitutional?

523 U.S. at 602, 118 S.Ct. 1584. The Court, however, did not address that issue, a failure which Chief Justice Rehnquist, in his dissent, described as both "puzzling and unfortunate."

> Puzzling, because immunity is a "threshold" question that must be addressed prior to consideration of the merits of a plaintiff's claim.... Unfortunate, because in assuming that the answer to the question is "no," the Court establishes a precedent that is in considerable tension with, and significantly undermines, *Harlow*.

*Id.* (internal citations omitted). Chief Justice Rehnquist suggested that the appropriate response would be that

> a government official who is a defendant in a motive-based tort suit is entitled to immunity from suit so long as he can offer a legitimate reason for the action that is being challenged, and the plaintiff is unable to

### Qualified Immunity in Motive–Based Constitutional Torts

The qualified immunity doctrine, as formulated in *Harlow*, employs an objective standard, which, as the Supreme Court has observed, lends itself to resolution on summary judgment since it focuses on the objective reasonableness of a government official's actions in light of clearly established law, and not on what the government official subjectively intended. *Crawford–El*, 523 U.S. at 588, 590, 118 S.Ct. 1584. Thus, for a defendant to secure summary judgment based on a defense of qualified immunity, he must show that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ], could conclude that it was objectively unreasonable [5] for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (internal citations and quotations omitted).

But, in cases such as this, involving what the Second Circuit has referred to as "motive-based constitutional torts," "it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto*, 264 F.3d at 169 (citing *Crawford–El*, 523 U.S. at 589, 118 S.Ct. 1584). To hold otherwise would effectively "immunize all defendants in cases involving motive-based constitutional torts, so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds." *Hoard v. Sizemore*, 198 F.3d 205, 218 (6th Cir.1999) (cited with

approval in *Locurto*, 264 F.3d at 169). Thus, the Second Circuit has held that where motive or intent is part of the constitutional tort, the employer's actual subjective motive is not irrelevant in a qualified immunity inquiry. *Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir.1995). Rather, where the subjective state of mind of the actor is part of the "constitutional mix," the Court has developed a rule that balances the interests of the official claiming immunity against the interests of the employee asserting unconstitutional motive,

> [U]pon a motion for summary judgment asserting a qualified immunity defense in an action in which an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts ... supporting the claim of an improper motive in order to avoid summary judgment.

*Id.* "This standard allows an allegedly offending official sufficient protection against baseless and unsubstantiated claims, but stops short of insulating an official whose objectively reasonable acts are besmirched by a prohibited unconstitutional motive." *Sheppard v. Beerman*, 94 F.3d at 828. Thus, to defeat Defendants' claim of qualified immunity, the Plaintiff must show "particularized evidence of direct or circumstantial facts" supporting her claim of unconstitutional motive in order to survive a motion for summary judgment on the defense of qualified immunity. *Id.*

### The Record in the Instant Case

Viewing the record in the light most favorable to Plaintiff, as we are required to

---

establish, by reliance on objective evidence, that the offered reason is actually a pretext. *Id.*

**5.** The objective reasonableness test is met— and the defendant is entitled to immunity—if "officers of reasonable competence could disagree" on the legality of the defendant's actions. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

do, the record indicates that, in the late 1980's and early 1990's, Plaintiff and Defendant Arthur Rocque, who was then head of the DEP's Coastal Program, had some disagreements concerning two matters before the department involving the granting of coastal permits. This led to the exchange of heated memoranda and a deterioration in their working relationship. (Pl.'s Aff. ¶ 1; Pl.'s 9(c)2 St. ¶ 5.)

With the appointment in 1995 of Defendant Sidney Holbrook as Governor Rowland's new Commissioner of the DEP, and Defendant Rocque's elevation to Deputy Commissioner, Plaintiff alleges that this acrimony developed into a "campaign of harassment" involving Defendants Rocque and Holbrook and eventually Defendant Jane Stahl. (Pl.'s Mem. at 5.) In support of this claim, she cites to the fact that just days after Holbrook's appointment as Commissioner of the DEP, he informed her that he would prefer to have someone else serve as chief counsel and that she would be demoted to her replacement's former position, although she would retain her same salary. (Pl.'s Aff. ¶ 3(b).) Plaintiff states that she had to retain counsel and threaten legal action to retain her position.

Soon thereafter, Plaintiff states that Deputy Commissioner Rocque banned her from attending water pollution bureau staff meetings, which she had attended for years. (Pl.'s 9(c)2 St. ¶ 8.)

With respect to one particularly controversial matter in early 1996, Rocque told Plaintiff that he did not want any decisions made with regard to this matter without checking with him first. (Pl.'s Ex. 33.) Instead, Plaintiff communicated her legal opinion about the matter to Commissioner Holbrook, who was her direct supervisor, and to the Attorney General's Office, with whom she had been directed to work. Rocque reprimanded her for this, accusing her of acting unilaterally and foreclosing other options the DEP could have pursued, an accusation that Plaintiff asserts is false. (Pl.'s Aff. ¶ 5(c).) This led to an exchange of caustic memoranda between them (Pl.'s Ex. 29—32), including the "King Arthur Memo" addressed to Rocque as "King Arthur (and I don't mean the flour company)" from Plaintiff, who referred to herself as "Lowly Me." (Defs.' Ex. No. 48.)

The next incident involved what the parties have referred to as "the Amtrak matter," in which Plaintiff claims she was subject to discipline when she gave Defendants legal advice that they did not want to hear. She asserts that Rocque told her that her input into matters such as this was useful and welcome only when timely and when in the direction that the rest of the Department was going. (Pl.'s Aff. ¶ 6(f).) Plaintiff viewed this as an attempt to "muzzle" her when she gave legal advice contrary to what he wanted to hear. (Pl.'s Aff. ¶ 6; Pl.'s Ex. 3.) Plaintiff once again retained counsel because of what she perceived to be threatened disciplinary action. (Pl.'s 9(c)2 St. ¶ 10.)

In August, 1996, Holbrook's written evaluation of Plaintiff's job performance stated that she "needed improvement." When Plaintiff accused Holbrook of retaliating against her, she claims that he pointed his finger at her and stated loudly, "You're the one who brought a lawyer into this!" (Pl.'s Aff. ¶ 7(b).) Plaintiff claims that she was never provided with any justification for her performance evaluation and that this was the first time she had received a less than satisfactory performance evaluation. (*Id.;* Pl.'s 9(c)2 St. ¶¶ 1, 11.) Soon afterwards, Commissioner Holbrook changed Plaintiff's reporting relationship from himself to Assistant Commissioner Rocque. (Pl.'s 9(c)2 St. ¶ 12.)

Plaintiff states that in the fall of 1996, she received a memorandum from Rocque

in response to a draft decision she had prepared involving a permit application. She states that she viewed this memorandum as limiting her ability to provide the agency with legal advice. She prepared a memorandum to Holbrook and Rocque to this effect. (Pl.'s Aff. ¶ 8; Pl.'s Ex. 4.)

In October, 1996, Plaintiff provided Defendants with legal advice relating to three coastal consent orders. Six months later, she states that Rocque, in a memorandum, chastised her for this advice and sent a copy of the memorandum to the program director. Defendants maintain that there had been an inordinate delay in getting the orders issued and blamed Plaintiff for the delay. (Pl.'s Aff. ¶ 9.)

The following year, in October, 1997, Commissioner Holbrook was named as the co-Chief of Staff to Governor Rowland (and was given responsibility for the direction of DEP's interaction with the Governor's Office) and Rocque became the Acting Commissioner of the DEP. Rocque then named Stahl, who had been Assistant Director of the Coastal Program, to the position of Assistant Commissioner.

In January 1998, as part of her job duties, Plaintiff responded to a Freedom of Information Act ("FOIA") request, concerning a federal computerized criminal database that could be accessed via DEP computers, by releasing certain non-privileged DEP documents to the *Hartford Courant*. Plaintiff maintains that, because of the unfavorable political content of these documents, she was chastised by Stahl for releasing these documents, and the responsibility of responding to FOIA requests was taken from her. Stahl also banned her from having any further communications with the Attorney General's Office regarding the specific request in question. (Pl.'s Aff. ¶ 10; Pl.'s Ex. 5; Pl.'s 9(c)2 St. ¶ 15.)

Shortly thereafter, Plaintiff provided legal advice to Stahl and Rocque regarding the application of Title VI to an air emissions permit proceeding, which had been objected to by various minority neighborhoods around the subject facility. Stahl criticized Plaintiff for her advice, and Stahl and Rocque prohibited her from continuing to work on the matter and turned the matter over to another attorney. (Pl.s Aff. ¶ 11; Pl.'s Ex. 6, 7 & 8.)

In June 1998, Rocque announced a reorganization of the DEP, which dissolved counsel's office, reassigned the staff attorneys to the supervision of the DEP's various bureau chiefs, and removed most of Plaintiff's substantive responsibilities. (Pl.'s 9(c)2 St. ¶ 16.) In his memorandum announcing the reorganization, Rocque criticized the performance of the counsel's office and cited as reasons for the reorganization the response to the FOIA requests and advice given on the Title VI matter, both of which involved Plaintiff. Plaintiff claims to have been the only person in the agency who lost staff. Once again, she hired legal counsel and thereafter, her duties and staff were restored. (Pl.'s Aff. ¶ 13.)

Nevertheless, she claims that the retaliation continued with Defendants' banning her from Senior Staff meetings, which she had been attending since 1988, and from the weekly meetings of bureau chiefs and division directors, which she had always attended. (Pl.'s Aff. ¶ 20(b).) They also changed department procedures so that she no longer reviewed the hearing officers' proposed decisions; they stripped counsel's office of its longstanding responsibility for formulating enforcement policies and drafting regulations relating to enforcement actions. *Id.* Rocque also eliminated Plaintiff's role in drafting legislative proposals, and Rocque and Stahl removed her responsibility for drafting the

Commissioner's responses to intervention requests. *Id.*

In the fall of 1998, Plaintiff was removed as counsel to the final decision-maker on a high profile and highly controversial matter. Plaintiff received a memorandum from Rocque accusing her of violating his express instructions, despite Plaintiff's claim that she had written Rocque requesting clarification on this matter. (Pl.'s Aff. ¶ 14; Pl.'s Ex. 16 & 17.)

In another matter, after Rocque chastised the Air Staff for seeking an extension of time to file a brief, Plaintiff wrote Stahl criticizing the position taken by Rocque and suggesting that Air Staff would have been derelict in not requesting additional time. (Pl.'s Aff. ¶ 15(h).) Stahl responded to this memorandum accusing Plaintiff of attempting to "broaden [her] audience" and advising her that she was free to express her opinion "to the extent that it does not undermine the operation of this agency." (Pl.'s Aff. ¶ 15(k); Def.'s Ex. 40.)

When the *Hartford Courant* published an article quoting Rocque as stating that a DEP lawyer had given him certain legal advice, Plaintiff, concerned that it would appear that the article was referring to her, wrote Rocque denying that she or her staff had given him that legal advice. Defendant Stahl responded to this memorandum, giving Plaintiff a "written warning that such conduct is not acceptable" and threatening Plaintiff with "disciplinary action" if there were future incidents. (Pl.'s Aff. ¶ 15(n); Def.'s Ex. 41.)

On September 30, 1999, when Plaintiff states that her job had become "unlivable," Plaintiff filed the instant action challenging what she considered to be Defendants' unconstitutional acts of retaliation against her.

In January of 2000, another incident occurred when Plaintiff and three other staff members of Counsel's Office prepared a draft memorandum raising concerns about a final decision that had been rendered by Rocque. Stahl received a copy of the memorandum and verbally charged Plaintiff with unprofessional conduct, exercising bad judgment, and acting in a manner that was not in the best interests of the agency. She instructed Plaintiff not to speak to anyone regarding the memorandum or any of the issues involved in the proceeding. (Pl.'s Aff. ¶ 16.)

Plaintiff lists in her affidavit numerous other examples where she claims to have sought to advise one or more of the Defendants on how they should act in accordance with specific statutory requirements or standards and, in response to this advice, she was subjected to criticism, professional attacks, and harassment.

It is undisputed that Plaintiff was terminated following her attempted intervention in a third-party matter brought before the Freedom of Information Commission of the State of Connecticut ("FOIC").[6] The events leading up to her termination involved a FOIA request from the *Hartford Courant* relating to a specific matter. Plaintiff asserts that the DEP selectively claimed the attorney-client privilege with

---

6. This was a proceeding brought by Daniel P. Jones, a reporter, and the *Hartford Courant* against the Commissioner of the DEP and the DEP, Docket # FIC 2000–164, in which the complainants were seeking a number of records relating to the removal of Plaintiff from the Canterbury transfer station case. The DEP claimed that a number of the documents were privileged and not subject to the mandatory disclosure provision of FOIA. The complainants appealed, and, after an *in camera* review of the documents withheld, the FOIC agreed, finding that certain records pertained to strategy in pending litigation and others contained privileged attorney-client communications and, thus, were not subject to mandatory disclosure, pursuant to Conn. Gen. Stat. §§ 1–210(b)(4) and (10).

respect to some documents but released others so as to make her appear "incompetent, devious, unprofessional, perhaps even infantile." (Pl.'s Dep. II at 87.) Plaintiff was of the opinion that some of the documents that were produced contained privileged material and should not have been produced, and that the non-privileged portions of other documents should have been produced, which would have presented a more accurate picture. *Id.* at 92, 96. Plaintiff, through her attorney,[7] attempted to intervene in this matter before the FOIC. (Def.'s Ex. 5.) The DEP, through the Office of the Attorney General, objected to Plaintiff's intervention, and eventually the FOIC held that the DEP had correctly asserted the attorney-client privilege with respect to the documents

which had not been released. (Def.'s Ex. 7.)

Deputy Commissioner Stahl learned of this attempted intervention in April, 2000, following which she sought an opinion from Professor Trowbridge at Quinnipiac School of Law as to whether Plaintiff had breached a duty of loyalty owing to the DEP. In a six-page report, Professor Trowbridge opined that Plaintiff had violated the Connecticut Rules of Professional Conduct in her attempt to intervene in the FOIC matter, which violated her duty of loyalty owed to the DEP; her disclosure of confidential internal memoranda; and her public criticism of the DEP.[8] (Def.'s Ex. 8.) Attached to his report were a copy of the instant complaint, 25 newspaper articles from February 11, 1998, to May 20, 2000,[9]

7. Her attorney wrote the FOIC, pointing out that the DEP had released documents, which contained arguably privileged matter, that painted Commissioner Rocque and Assistant Commissioner Stahl in "very nice colors," and painted her "in the colors of a villain in every way." (Pl.'s Dep. II at 93.) Plaintiff felt that, by releasing the documents that they did, Defendants had waived any claim of privilege and were using the cloak of privilege for an improper purpose. *Id.* at 93.

8. Professor Trowbridge's Report articulated three separate violations by Plaintiff of the Connecticut Rules of Professional Conduct:

(1) Attorney Rapkin's attempt to intervene in the FOI matter brought by a third party was a breach of the duty of loyalty she owed to her agency;

(2) Attorney Rapkin's disclosure through her counsel of the existence of DEP documents that Attorney Rapkin believed relevant to the FOI matter, including identifying memos she had written to DEP officials, appears to have been the voluntary disclosure of confidential information relating to representation. To the extent that she voluntarily disclosed client confidences in advancing her position in the FOI matter, she breached her duty to maintain her client's confidences; and

(3) To the extent that Attorney Rapkin and her counsel have publicly criticized DEP for

failing to take her advice or adopting policy views she does not share, Attorney Rapkin has violated her duty of loyalty to her client. It should be noted that this is strictly the opinion of Professor Trowbridge, based upon information provided to him. Plaintiff disputes his findings and adamantly denies that she released any privileged documents to the FOIC.

9. The newspaper articles highlight the internal conflicts that had developed between Plaintiff and Defendants and Plaintiff's criticism of the DEP. Two examples are the following articles:

"More Turmoil at the DEP," *The Hartford Courant* at A10 (Aug. 5, 1998), discussing a July 6 memo from Plaintiff which describes DEP as "an agency in which professionals are threatened with punishment if they refuse to go easy on polluters," and suggesting that the memo may have "political underpinnings" because of the gubernatorial election campaign. The article also discusses Rocque's decision to remove and then restore Plaintiff as supervisor of the DEP legal staff, which "only fuels the belief that there's a firestorm brewing at the agency. Many dedicated employees are no doubt demoralized by the dysfunction in the department."

"DEP Nearing 'Rocque' Bottom," *The Hartford Courant* at C3 (Nov. 14, 1999), criticiz-

three letters concerning Plaintiff's attempted intervention in the FOIC matter,[10] and a copy of the job specifications for Plaintiff's position.

Following her receipt of the Trowbridge Report, Deputy Commissioner Stahl recommended Plaintiff's termination to Commissioner Rocque. On November 21, 2000, Stahl wrote Alan Mazzola, the Assistant Commissioner of the Department of Administrative Services, requesting that he conduct a Loudermill Hearing, pursuant to section 5–240–7a of the Connecticut State Agency Regulations.[11] (Def.'s Ex. 9.) For purposes of this hearing, the DEP provided the Hearing Officer with the written opinion of Professor Trowbridge, as well as the attachments to his report. A Loudermill hearing was conducted on

December 15, 2000, at which Deputy Commissioner Mazzola addressed the three violations set forth in Professor Trowbridge's Report. Following the hearing, at which both Plaintiff and her counsel were present, Deputy Commissioner issued a written report, recommending that Plaintiff be terminated from her position as Legislative and Administrative Manager at the Department of Environmental Protection. He found that she had breached the duty of loyalty she owed to the DEP and her duty to maintain her client's confidences, which "made it impossible for her to continue to represent Commissioner Rocque, or the Department of Environmental Protection." (Def.'s Ex. 10, Recommendation of the Loudermill Hrg. Officer in the Matter of Anne Rapkin dtd. 12/15/00 at 4.[12]) [13]

---

ing Rocque for embarking on a "five-year campaign of harassment, culminating in Plaintiff's demotion, because her views did not suit his political agenda," and describing Rocque and Holbrook's efforts to "marginalize" Plaintiff "while transforming the DEP into an agency that has made a mockery of environmental protection and has been roundly criticized by everyone from the state auditors to watchdog groups." The article also discusses this lawsuit in which Plaintiff is "claiming officials illegally harassed and silenced her ... [b]ecause she was doing her job, fighting for strict environmental oversight and holding polluter accountable for their actions."

**10.** The letters provided to Deputy Commissioner Mazzola were as follows:

Letter dated May 18, 2000, from Attorney Ruth Pulda, attempting to intervene in the FOI matter;
Letter dated May 26, 2000, from Assistant Attorney General Sharon A. Scully to Mitchell Pearlman, Esq., Executive Director of the Freedom of Information Commission, requesting that Attorney Pulda's letter be excluded from the case file;
Letter dated May 31, 2000, from FOI Commissioner Sherman D. London to Attorney Pulda, informing her that her May 18, 2000 letter would not be part of the record in the FOI case.

**11.** Section 5–240–7a(a) of the Connecticut Agencies Regulations provides certain prediscipline procedures applicable to state employees:

Prior to a decision to suspend an employee, demote an employee except at the request of the employee or dismiss an employee, the appointing authority shall provide the employee with oral or written notice. The notice shall include what form of action is being considered, shall contain a concise statement explaining what evidence supports the imposition of the action that is being considered and shall state a specific time and place for a meeting where the employee will be given an opportunity to present his side of the story and reasons why the employee feels that the action being considered should not be taken. The meeting will be held by the appointing authority or the appointing authority's designee.

**12.** The Hearing Officer's Report is incorrectly paginated, with "page 1" beginning on the second page of the report. (Def.'s Ex. 10, No. D 0675). For purposes of this decision, we have used his page numbering.

**13.** He concluded that the "first two charges cited by Professor Trowbridge are much more serious then [sic] the last." (Def.'s Ex. 10 at 4.) "Regarding the first, the act of authorizing

Following their receipt of Deputy Commissioner Mazzola's recommendation, Stahl and Rocque determined that there was "no viable alternative" except to terminate Plaintiff. (Def.'s Ex. 12 & 13.) On January 5, 2001, Commissioner Rocque wrote Plaintiff, terminating her employment effective January 19, 2001:

> My decision to end your employment is based on the report and attachments prepared by Professor Trowbridge which has been provided to you, the information you and your attorney provided at the Loudermill meeting held on December 5, 2000, including your admissions that you authorized your attorneys to intervene in a matter, brought against the DEP by a third party, released confidential documents and publicly criticized your client, the recommendation of Department of Administrative Services' Deputy Commissioner Alan Mazzola and my consultations with your immediate supervisor, Deputy Commissioner Jane Stahl. This information has convinced me that, in the best interest of the agency and the responsibilities that I oversee, there is no alternative but to end your employment as your conduct constitutes "just cause" under Regulations of Connecticut Agencies § 5–240–1a(c), including, without limitation, Regulations of Connecticut Agencies §§ 5–240–1a(13)(11) and (8). Your actions have convinced Commissioner Stahl and me

that there is no other assignment within your job classification series that will assure protection of the agency's interests.

(Def.'s Ex. 14.) Plaintiff states that terminating a civil service employee is "almost unheard of," (Pl.'s 9(c)2 St. ¶ 42), and that Defendants could name only one other civil service employee who had been terminated, and that was for conducting criminal acts on DEP time. *Id.*

Thereafter, Plaintiff amended her complaint in this action to include an allegation that she had been terminated in retaliation for exercising her First Amendment rights.

### Whether Defendants Are Entitled to Summary Judgment on Their Qualified Immunity Defense

■■■ Plaintiff has proffered sufficient evidence supporting her free speech claims from which we can conclude, for purposes of considering Defendants' qualified immunity defense, that at least some of her speech was on matters of public concern.[14] Additionally, she has proffered evidence that, at various times, she asserted her right to redress, including the filing of this lawsuit, and thereafter she suffered adverse employment actions. Thus, we turn to the question of whether Defendants are entitled to summary judgment on their qualified immunity defense.

---

her attorneys to intervene in a matter brought against her client (DEP) by a third party clearly is something that Commissioner Rocque and his management staff do not have to tolerate." *Id.* He also found that, by so doing, Plaintiff had put her own personal interests before those of her client. *Id.* He also found that Plaintiff had violated the Rules of Professional Conduct when she released confidential documents. *Id.* at 3. Finally, regarding the newspaper articles, the Hearing Officer found that Plaintiff had publicly criticized her client, had revealed information relating to the representation, and had independently

taken steps "to do so in one of the most public forums available, the print media." *Id.* at 4.

**14.** Because we find genuine issues of material fact as to Defendants' motivation, we need not decide precisely which speech was protected nor do we decide the outcome of the *Pickering* balancing test. *See Locurto*, 264 F.3d at 168 (holding that the balancing test was incapable of disposing of plaintiffs' First Amendment claim in light of the factual issue as to intent).

Plaintiff concedes that it would have been objectively reasonable for Defendants to believe that they were not violating Plaintiff's constitutional rights by terminating her because of her attempted intervention before the FOIC, which was adverse to the position taken by the DEP, if that were the sole motivating reason for her termination. (Pl.'s Mem. at 62.) Plaintiff, however, asserts that her claims relating to pre-termination retaliation are unaffected by the attempted intervention and, as to her termination claim, she maintains that there are "an overwhelming set of material facts from which a jury could determine that the [D]efendants' termination decision was motivated in whole or in substantial part not by the attempted intervention but by the long history of animus resulting from the plaintiff's protected speech, and her invocation of her right to redress." (Pl.'s Ltr. Brief Dtd. 9/23/02 at 2.). Defendants disagree and argue that, although there had been a history of disputes between the parties, one cannot reasonably infer from that fact that Defendants intended to interfere with Plaintiff's constitutional rights.[15] This is particularly true in this case, where, they argue, the undisputed facts show that Plaintiff breached a duty of loyalty owing to her client by attempting to intervene in a manner adverse to her client, and that her entire motivation for seeking to intervene was personal, to protect her reputation.

Defendants' own documents, including the Trowbridge Report, the Recommendation of Hearing Examiner Mazzola, and Defendant Rocque's termination letter, belie their assertion that their termination of Plaintiff, more than nine months after

Plaintiff's attempted intervention, was motivated solely by the intervention issue. The documents themselves indicate that Plaintiff's public criticism of the DEP played at least some role in this decision. Whether other factors motivated their decision to terminate Plaintiff—such as the long history of conflict between Plaintiff and Defendants, or Plaintiff's criticism of decisions made by Defendants, or their disagreement with legal advice provided by Plaintiff, or Plaintiff's speech on certain issues, or Plaintiff's filing of this lawsuit and threatening other redress, or some other factor—are questions of fact that cannot be resolved on summary judgment. Indeed, the Second Circuit has cautioned that summary judgment should be used "sparingly" when intent and state of mind are at issue. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000).

Plaintiff has proffered sufficient direct or circumstantial evidence supporting her claim of improper motive with respect to the adverse employment actions by Defendants prior to and in connection with her termination to avoid summary judgment based on Defendants' qualified immunity. Viewing the record in the light most favorable to the Plaintiff and drawing all reasonable inferences in Plaintiff's favor, as we are required to do, we find genuine issues of material fact as to whether the acts taken by Defendants against Plaintiff were motivated by her exercise of her right of free speech or her right to seek redress. Assuming that Plaintiff's exercise of her First Amendment rights was a motivating factor in Defendants' decision to terminate her or to take other adverse action against her, the shield of qualified immunity is lost. Accordingly, summary

---

**15.** In their summary judgment papers, Defendants take the position that this Court does not need to reach this question because the undisputed facts show that Plaintiff's attempted intervention was motivated solely for personal reasons and, therefore, did not constitute protected speech.

judgment may not be granted to Defendants on that basis. *See Munafo,* 285 F.3d at 212 (upholding the denial of summary judgment on qualified immunity grounds where the question of defendants' motivation plainly remained in dispute).

### Conclusion

In denying Defendants' motion for summary judgment on qualified immunity grounds, the Court is cognizant of defense counsel's concerns about the burdensome discovery that this ruling may unleash. Defense counsel has represented to the Court that there are at least 26 DEP cases as to which Plaintiff has sought discovery, some of which involve ongoing litigation and almost all of which raise significant attorney-client, work product, and deliberative privilege concerns.

Plaintiff's counsel is cautioned that all discovery requests should be tailored as narrowly as possible to the specific issues of this case. Because of Plaintiff's unique position as the former chief legal counsel, Plaintiff should be able to help narrow the scope of discovery. The Court will not tolerate discovery requests that are mere fishing expeditions. The Court will continue to refer all discovery matters in this case to Magistrate Judge William I. Garfinkel.

Accordingly, for the reasons set forth above, Defendants' Motion for Summary Judgment [Doc. # 100] is denied on the merits with respect to the qualified immunity defense. In all other respects, the motion is denied without prejudice to renewal after discovery is complete.

SO ORDERED.