Jose OLIVERA, Plaintiff,

v.

TOWN OF WOODBURY, NEW YORK, Lt. Richard Shore of the Town of Woodbury Police Department, and "JOHN DOE 1–N," Unidentified Officers of the Town of Woodbury Police Department Defendants.

No. 02CIV6010CMMDF.

United States District Court, S.D. New York.

Sept. 2, 2003.

Robert N. Isseks, Middletown, NY, for Joel Olivera, plaintiff.

## MEMORANDUM DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff brings a claim for (1) violation of his right to Equal Protection of the laws under both the Fourteenth Amendment of the United States Constitution, actionable under 42 U.S.C. § 1983 ("Section 1983"), and 42 U.S.C. § 1981; (2) violation of his rights under the Fourth Amendment of the United States Constitution, actionable under Section 1983; and (3) violation of his right to Due Process under the Fourteenth Amendment of the United States Constitution, actionable under Section 1983. (Plaintiff's Complaint ("Cmplt.") ¶ 5.) Plaintiff also asserts New York common law claims for defamation, negligence, and intentional infliction of mental distress. (Cmplt.¶ 8.)

On October 21, 2002, defendants moved to dismiss plaintiff's claims under Fed. R.Civ.P. 12(b)(6). On March 4, 2003, at my request, the parties agreed that the defendants' motion would be converted into a motion for summary judgment under Fed.R.Civ.P. 56, and both sides have submitted supplemental briefs and supporting documents, including those required under Local Rule 56.1.

For the reasons stated below, I now grant defendants' motion for summary judgment as to all of the federal claims. As that leaves only plaintiff's state law claims, I dismiss them without prejudice.

## BACKGROUND

### I. Factual Allegations

The following facts, unless otherwise noted, are undisputed:

On January 28, 2001, plaintiff was driving his brother's vehicle when he was stopped by officers of the Town of Woodbury Police Department. (Defendants' Rule 56.1 Statement ("Def.56.1"), 1, 2.) One of the officers asked the plaintiff for his driver's license. *Id.* at 5.[1] In response, plaintiff showed the officer a permit card which plaintiff believed enabled him to drive. *Id.* at 6. The officer retained the card. *Id.* at 7.

Plaintiff was issued tickets for (1) driving without a license; (2) driving without insurance; (3) failing to signal; and (4) passing on the right. *Id.* at 3. On April 3, 2001, plaintiff appeared in the Town of Woodbury Justice Court and disposed of all citations pending against him by pleading guilty to passing on the right. *Id.* at 4.

At some point after disposition of the vehicle and traffic violation charges against the plaintiff, Police Officer Christopher Freedman provided the confiscated permit card to Police Lieutenant Richard Shore. *Id.* at 10. Lt. Shore determined that the plaintiff's permit was not a valid driving permit in the United States. *Id.* at 12. Plaintiff claims that Lt. Shore made this determination without sufficient foundation. (Plaintiff's Response to Defendants' 56.1 ("Pltf. 56.1 Resp.") 12.)

Lt. Shore added plaintiff's permit card to a collection of false identification cards he maintains for use in crime prevention seminars for the police academy, security companies, and loss-prevention/sales personnel at Woodbury Commons, the retail outlet mall in Woodbury, NY. (Def.56.1, 11, 17, 18.) At these seminars, Lt. Shore teaches the participants how to determine the authenticity of identification cards. *Id.* at 19. Lt. Shore keeps approximately 12 to 15 identification cards in his collection, and uses them during the seminars as illustrative examples. *Id.* Not all the cards depict individuals of Hispanic descent. *Id.* at 28.

In July 2001, Lt. Shore was interviewed by Middletown Times Herald Record reporter Chris McKenna about shoplifting methods used at Woodbury Commons. *Id.* at 21, 22. Mr. McKenna's article, which appeared in the Times Herald Record on Tuesday, August 14, 2001, reported that a growing number of shoplifting crimes at Woodbury Commons were being committed by organized groups that drive in from New York City to go on "stealing sprees." (Times Herald Record, Ex. 1 to Affidavit of Robert N. Isseks in Opposition to Summary Judgment ("THR Article"), 2.) Mr. McKenna reported that:

> Shoplifting crews like these hit shopping centers up and down the East Coast, stealing goods to sell to street merchants or to buyers in Latin America at 30 to 50 cents on the dollar, police say.

*Id.* After describing Lt. Shore as the "resident expert on shoplifting at the Woodbury Police Department," McKenna reported that:

> Organized shoplifters—many of whom, Shore said, are immigrants from Mexico or South America who were recruited in New York City—generally come prepared to be caught.

---

**1.** Defendants have not specified in their Rule 56.1 Statement which officers were involved in stopping Mr. Olivera and issuing the citations, instead referring to the acts of "an officer" of the Town of Woodbury police. The deposition testimony of Lt. Richard Shore and the deposition testimony of Joel Olivera, read together, suggest that Police Officer Richard Jackson conducted the stop, and that Police Officer Christopher Freedman arrived later and provided assistance, but the deposition testimony does not clarify which officer performed which tasks. (Deposition of Lt. Richard Shore, Ex. D to the Declaration of Anthony B. Corleto ("Corleto Dec."), 5:19–9:24; Deposition of Joel Olivera, Ex. B to the Corleto Dec., 18:18–22.) These matters are not germane to the decision on the motion.

They either carry no identification or have phony cards with fake names, Shore said.

*Id.* McKenna went on to recount Lt. Shore's description of how the shoplifters worked. He also explained the security techniques used at Woodbury Commons. *Id.* at 2–3.

At both the beginning and end of the article, McKenna—using a common journalistic technique for catching the reader's interest—described courtroom scenes involving shoplifters. *Id.* In the passage at the end of the article, McKenna described fifty defendants waiting in a busy Town Hall courtroom while the Judge accepted a guilty plea from a 21–year–old woman, Karla Reyes–Rojas. *Id.* at 3. McKenna then described the court appearance of a man and woman from Queens who were arrested, without identification, for shoplifting five pairs of jeans. *Id.* McKenna reported that the couple was assisted by a Spanish-speaking interpreter hired by the court. *Id.*

The article on shoplifting at Woodbury Commons was illustrated with photographs taken by Middletown Times Herald Record photographer Dominick Fiorrile. (Def.56.1, 23.) The lead for the story, on the front page of the paper, is the headline "It's a Steal" above a photograph of three identification cards. (THR Article, 1.) One of the three identification cards in the photograph is the card confiscated from plaintiff on January 28, 2001. (Def. 56.1, 29.) The photograph's caption is "Fake identification cards confiscated at Woodbury Common Premium Outlets." (THR Article, 1.) A smaller headline, below the photo, states: "How five-finger-discount gangs are invading the regions's biggest mall. Story, Page 6." *Id.*

The photograph containing plaintiff's identification card was taken by Mr. Fiorrile while Mr. McKenna was interviewing Lt. Shore for the article. (Def.56.1, 23–

27.) Lt. Shore gave the reporter and photographer his entire collection of false identification cards—not all of which, obviously, were confiscated from persons arrested at Woodbury Commons. *Id.* at 24. However, there is no evidence that Lt. Shore represented that all the cards were so obtained. Rather, he told McKenna and Fiorille that all of the cards were examples of what he believed to be non-authentic identification. *Id.* at 25. Lt. Shore gave the journalists permission to photograph any of the identification cards that were in the envelope. *Id.* at 26. Mr. Fiorille selected the three identification cards for the photograph. *Id.* at 27. As noted above, Lt. Shore's collection of identification cards included cards that depicted non-Hispanic individuals. *Id.* at 28.

Plaintiff heard about the article from his brother-in-law after it was published in the August 14, 2001 edition of the Times Herald Record. *Id.* at 29, 31. He purchased a copy. *Id* at 33. Plaintiff, who can not read English, brought the newspaper to his employer at the pizzeria where he works, and his employer explained what the article said. *Id.* at 34. Plaintiff alleges that, as a result of the article, six or seven people, including customers of the pizzeria and employees of the adjacent barber shop, have made jokes about him. *Id.* at 37; Deposition of Joel Olivera, Ex. C to the Corleto Dec., 32:3–34:16. But no customers have stopped patronizing the pizzeria as a result of the article. (Def.56.1, 38.) And plaintiff concedes that his boss "didn't say anything bad" to him, that he did not lose wages or his job, and that he has not been refused service anywhere as a result of the article. *Id.* at 35, 36, 39. Further, plaintiff has not seen a psychiatrist or psychologist, or been physically ill as a result of the publication of the article. *Id.* at 41–42. Publication of the article has not affected plaintiff's relationship with his wife. *Id.* at 43.

## II. Plaintiff's Claims

Plaintiff does not dispute Lt. Shore's contention that his collection included identification cards with pictures of non-Hispanic individuals. *Id.* at 28. But plaintiff, who is of Mexican descent, argues that all three of the individuals who were depicted in the photographed identification cards are Hispanic.[2] (Cmplt.¶ 13.) Plaintiff alleges that "[t]he clear and intended implication of the inclusion of the photograph of plaintiff's driver's permit card on the front page of the August 14, 2001 edition of the Times Herald Record is that plaintiff is a shoplifter and that he is a member of one of the organized groups of shoplifters described in the aforementioned article." *Id.* at 16. As plaintiff has never been arrested or charged for larceny, he contends that this implication is both false and defamatory. *Id.* at 17, 18. Plaintiff claims that: "[a]t the time that Shore and/or Doe provided the Times Herald Record reporter and/or photographer with plaintiff's driver's permit card, said defendants knew, or should have known, that it would appear in the Times Herald Record newspaper in the manner in which it did appear in the August 14, 2001 edition as described above, and that it would contain and convey the defamatory implication that plaintiff is a shoplifter and a member of one of the organized groups of shoplifters mentioned in the article." *Id.* at 21. Plaintiff concludes that, "Shore and/or Doe acted on the unconstitutionally discriminatory basis that plaintiff is Hispanic" and that, by "assisting in the publication of the defamatory matter . . . Shore and/or Doe acted maliciously, recklessly, negligently, and

with deliberate indifference to plaintiff's constitutional and common law rights." *Id.* at 25, 26.

Insofar as his federal constitutional claims are concerned, plaintiff alleges that defendants' conduct violated his right to equal protection of the law under the Fourteenth Amendment, his right to privacy and personal integrity under the Fourth and Fourteenth Amendments; and his right to due process of law under the Fourteenth Amendment. (Cmplt.¶ 30.) Plaintiff sues for these alleged constitutional deprivations under 42 U.S.C. § 1983 ("Section 1983"). (Cmplt ¶ 5.) Plaintiff also sues for violation of his equal protection rights under 42 U.S.C. § 1981 ("Section 1981"). Finally, plaintiff brings New York state common law claims for defamation, negligence, and intentional infliction of mental distress. (Cmplt.¶ 31.) The common gravamen of these allegations is that Lt. Shore engaged in "racial profiling."

Plaintiff explains his constitutional claims in his memorandum in opposition to dismissal under Rule 12(b)(6). First, in what he refers to as his "Equal Protection Claim," plaintiff asserts that one can fairly infer from the factual allegations in his complaint that the police intentionally assisted the press in suggesting that he was arrested for shoplifting "solely because [he] is Hispanic and Hispanics have been known to commit that crime." (Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Pltf.12(b)(6) Mem."), 7.) Second, in his "Fourth Amendment Claim," plaintiff charges that Shore's re-

---

**2.** I note that, although there are several copies of the article in the record, the quality of the reproductions—both of the documents submitted to chambers and those filed with the clerk of the court—are so poor that it is impossible to determine whether the racial ethnicity of the individuals depicted in the photograph is clearly discernable. However,

I will accept, *arguendo,* plaintiff's contention that all three of the individuals pictured are Hispanic. I further note that neither party submitted information regarding the other two individuals depicted; there is no evidence in the record regarding whether either was involved in shoplifting at Woodbury Commons.

tention and use of his (legally) seized driver's permit violated his privacy rights, under a theory analogous to that underlying the constitutional infirmity of a staged parading of a suspect for the media (referred to as a "perp walk" *See Lauro v. Charles,* 219 F.3d 202 (2d Cir.2000)). Finally, plaintiff makes a "Due Process Claim" that his rights were violated because the police action at issue here—giving an arrested individual's photograph identification card to the press when he did not commit the crime under discussion—is either inherently vocative of his substantive due process rights or is so shocking to the conscience as to work a constitutional violation.[3]

Defendants contend that the evidence in the record does not support any of the plaintiff's allegations as a matter of fact. Alternatively, defendants invoke the protection of qualified immunity, claiming that under the facts in the record, no reasonable law enforcement officer would have had reason to know that Lt. Shore's alleged conduct violated the constitution.

## DISCUSSION

### I. Standard of Review

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has made such a showing, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Discovery has failed to reveal any evidence regarding the participation of any previously unidentified Woodbury Police Officers in the events surrounding plaintiff's claims. Rather, the undisputed facts show that Lt. Shore alone provided the Times Herald Record reporter and photographer with plaintiff's identification card. To the extent that plaintiff continues to pursue claims against "John Doe 1–N," those claims are dismissed with prejudice.

### II. Plaintiff's Equal Protection Claim

#### A. Section 1983 Claim Based on the Equal Protection Clause of the Fourteenth Amendment

Plaintiff alleges that, in providing his identification card to the Times Herald

---

**3.** While plaintiff alleged in his complaint that defendants violated his right to "privacy and personal integrity under the Fourth and Fourteenth Amendments," in his memorandum in opposition to dismissal he discusses his claims separately under each amendment. I respond to plaintiff's arguments in this opinion under the framework he employs in his memorandum.

Record, Lt. Shore acted on the "unconstitutionally discriminatory basis that plaintiff is Hispanic." (Cmplt.¶ 26.) Plaintiff claims that Lt. Shore's actions constituted "racial profiling." (Pltf.12(b)(6) Mem., 4.)

■ Section 1983 provides in pertinent part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured..." Section 1983 provides a means for a private party to sue a party acting "under color of law." Because Lt. Shore was acting under color of state law, as a member of the Town of Woodbury police department, when he was interviewed by McKenna and Fiorille, the so-called "state action" requirement is met—or would be met, if anything that Lt. Shore did actually violated plaintiff's rights. No reasonable trier of fact could find that they did.

■ The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. It "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) *quoted in Brown v. City of Oneonta,* 221 F.3d 329, 337 (2d Cir.2000). An act of overt racial discrimination can provide the basis for a viable Fourteenth Amendment violation under the equal protection clause. *See generally, Birnbaum v. Trussell,* 347 F.2d 86, 90 (2d Cir.1965) (finding that the plaintiff's allegations were too vague and conclusory to constitute "the type of overt act necessary to establish racial discrimination as barred

by the equal protection clause of the Fourteenth Amendment.")

Plaintiff does not seek to challenge a race-based statute or policy of the police, and he does not claim that the defendants' actions had a disparate impact on his minority group. Rather, he alleges that in a specific incident, he himself was deprived of equal protection under the law. The Supreme Court has "recently reaffirmed [that] equal protection claims can be brought by a 'class of one' where a plaintiff alleges that she has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *African Trade & Info. Ctr., Inc. v. Ambromaitis,* 294 F.3d 355, 362–63 (2d Cir.2002) *quoting Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)(per curiam) (citations omitted).

■ Defendants' motion must be granted because plaintiff fails to offer any evidence that the inclusion of his identification card in the Times Herald Record photograph, and the exclusion of cards depicting non-Hispanic individuals, was the work of Lt. Shore. Plaintiff does not dispute Lt. Shore's testimony that he provided the photographer, Mr. Fiorille, with the entire collection of cards, or that the collection contained identification cards depicting both Hispanic and non-Hispanic individuals. (Def.56.1, 24, 28.) And plaintiff does not dispute Lt. Shore's testimony that Fiorille himself selected which cards to photograph. *Id.* at 27. There is no evidence that Lt. Shore was given an opportunity to review the selected cards before they were photographed, or to review the article and its accompanying photograph prior to publication to ensure its accuracy. Neither is there any evidence that Lt. Shore told Fiorille that every phony identification card in his collection was confiscated from a shoplifter. All he said was that they

were exemplars of non-authentic identification. Finally, there is no evidence in the record before me to suggest that Lt. Shore's description of the activities of shoplifting gangs at Woodbury Commons or the ethnic background of shoplifters who were arrested there was untrue. As this court has previously held, the police have the right to provide the press with accurate information about police activities. *Caldarola v. County of Westchester*, 142 F.Supp.2d 431, 443 (S.D.N.Y.2001).

So on the undisputed evidence, a police officer (a state actor) provided a collection of mixed-race identification cards to a representative of the press (not a state actor); the police officer stated only that the cards were exemplars of false identification; the press representative selected several identification cards to photograph in order to illustrate a story on shoplifting; the press representative included the identification card depicting plaintiff, who was not a shoplifter; but the police officer had nothing to do with which pictures were selected or the suggestions made via sensational headlines that were concededly written by press representatives.

■ Plaintiff argues that this evidence "raises an issue of fact which cannot be summarily determined: whether Shore acted with discriminatory intent or purpose when he handed his collection of photo ID cards to the Times Herald Record reporter and photographer." (Plaintiff's Memorandum in Opposition to Summary Judgment ("Pltf. 56 Mem."), p. 2.) It is true, as the Second Circuit stated in *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991), that "a victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." However, there is simply no circumstantial evidence of intentional discrimination against plaintiff by Lt. Shore.

Plaintiff first argues that an inference of discriminatory intent arises from the fact that, at the time Lt. Shore gave the photographer permission to take pictures of the identification cards, Lt. Shore was telling the reporter that (1) "organized gangs" of shoplifters in Woodbury Commons were selling stolen goods to street merchants or to buyers in Latin America and (2) many of the shoplifters "are from Mexico or South America." Plaintiff points out that "[t]he news article based on Shore's interview makes no mention of any other race, ethnic group or national origin." (Pltf. 56 Mem., 4.) Plaintiff claims that these facts indicate Lt. Shore's discriminatory feelings towards Hispanics, and could support an inference that he then acted with discriminatory intent.

But plaintiff points to no evidence whatever from which a rational jury could infer that Lt. Shore provided the journalists with a false description or impression of shoplifting patterns at Woodbury Commons. And while plaintiff further urges an inference of impropriety from the fact that Lt. Shore's statements regarding the habits and characteristics of the shoplifters at Woodbury Commons "fit neatly with the concluding section of the news article which describes a presumably typical afternoon in local justice court," plaintiff ignores the crucial fact that it was the Times Herald Record reporter, not Lt. Shore, who attended and reported on the court appearances of Ms. Reyes–Rojas and an unidentified Spanish-speaking couple. *Id.* There is absolutely no evidence that Lt. Shore is responsible for what the reporter saw in Court or how the reporter described what he saw in the newspaper. Indeed, there is no evidence that Lt. Shore went to court with the reporter or that he knew what the reporter saw in court and was thus able to tailor his comments to the reporter's existing impressions about Hispanics. For all I know, the reporter may

not have even visited the courtroom until after his interview with Lt. Shore.

Plaintiff does not suggest that Shore made any comments about him personally to the reporters, or pointed him out as a shoplifter. Rather, plaintiff accepts as true defendants' assertion that Lt. Shore's comments were about Hispanics generally and their participation in shoplifting at Woodbury Commons. Nevertheless, plaintiff argues that, because Lt. Shore knew that plaintiff's card was obtained after a traffic violation—not a shoplifting arrest—and still allowed the card to appear in an article about Hispanic shoplifters, he showed a deliberate indifference to the truth, which could lead a rational juror to find "that Shore's remarks about Hispanics were invidious, or, at the very least, based on racial stereotyping." *Id.* at 5, 6. Plaintiff contends that, from there, a rational juror could conclude that Shore intended for the reporter to pick out only those cards belonging to Hispanic persons.

Plaintiff's argument misses the point. Shore's comments about the activity of Hispanic shoplifting gangs at Woodbury Commons no doubt influenced the photographer to choose identification cards depicting Hispanics from among those in the collection—it would be foolish to pretend otherwise. But the only alleged falsity is the depiction of plaintiff as a shoplifter—not the presence of Hispanic shoplifters at Woodbury Commons. That falsehood was perpetrated by the Times Herald Record, not by Shore.

The allegation here, viewed most generously to plaintiff, is that Shore intentionally caused the reporter to select plaintiff's photograph when he is not a shoplifter. On the undisputed facts, there is simply no evidence that he did. There is no evidence that Lt. Shore told the Times Herald Record journalists that the cards were obtained from shoplifters; to the contrary, it is undisputed that he explained that the cards were examples of what he believed to be non-authentic identification cards. (Def.56.1, 25.) Lt. Shore can not be faulted if the reporter or photographer erroneously concluded that all the cards were confiscated from shoplifters. There is certainly no evidence in the record that Lt. Shore knew that the caption of the photograph would claim that the identification cards had been obtained from shoplifters arrested at Woodbury Commons.

Finally, in order to sustain a "class of one" equal protection claim under Section 1983, plaintiff must demonstrate, *inter alia,* that he was treated differently than similarly situated persons who were not members of his protected class. *African Trade & Info. Ctr.,* 294 F.3d at 362–63. Here again he fails to raise any issue of fact. The only similarly situated persons in this scenario were non-Hispanics whose identity cards were in Lt. Shore's collection. But to the extent that Lt. Shore (the party defendant under Section 1983) acted, he did not discriminate. He provided the reporter and photographer with all the identity cards, Hispanic and non-Hispanic alike. Fiorille selected which cards he would use to illustrate the article. If anyone was engaged in racial profiling here, it was McKenna and Fiorille, not Lt. Shore. But the press is a private actor and cannot be sued under Section 1983.

What we have here, of course, is an accident or mistake by the reporters, or at most negligence on Lt. Shore's part in not going through his collection and weeding out persons (of whatever race) who were not arrested for shoplifting prior to giving the identification cards to Fiorille. But the Fourteenth Amendment covers only intentional discrimination. *African Trade & Info. Ctr.,* 294 F.3d at 363. Because plaintiff has not offered any evidence to support his allegation of intentional discriminatory conduct by Lt. Shore, I grant

summary judgment to defendants on plaintiff's Section 1983 claim based on violation of the equal protection clause of the Fourteenth Amendment.

### B. Section 1981 "Equal Protection" Claim

■ Section 1981 provides in pertinent part that "[a]ll persons... shall have the same right... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties... and exactions of every kind, and no other." 42 U.S.C. § 1981. Unlike Section 1983, a Section 1981 violation is not based on an underlying violation of a constitutional right, but rather provides an alternative statutory remedy for violations that concern an activity enumerated in the statute.

■ Section 1981 has long been viewed as prohibiting certain forms of race-based discrimination. *Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir.1988). To establish a Section 1981 claim, the plaintiff "must allege facts in support of the following elements: 1) the plaintiff is a member of a racial minority; 2) an intent to discriminate on the basis of race by the defendant; and 3) the discrimination concerned one or more of the activities enumerated in the statute..." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993). It is essential that plaintiff establish "that the defendants' acts were purposefully discriminatory and racially motivated." *Albert*, 851 F.2d at 571 (citations omitted). A claim may arise under Section 1981 when a plaintiff is deprived of the "full and equal benefit of the law and proceedings [afforded to] white citizens." *Lucas v. New York City*, 1995 WL 675477, at *3 (S.D.N.Y. Nov.14, 1995) (denying motion to dismiss claims against officers who "subjected [plaintiff] to unfairly harsh treatment because of his race ... [b]ecause this would deny to a member of a protected class the 'full and equal benefit of [the] laws'") (*citing Marcus v. Carrasquillo*, 782 F.Supp. 593, 599 (M.D.Fla. 1992) (denying motion to dismiss claims against officers when plaintiff alleged purposeful discrimination on the basis of his race, and concluding that plaintiff had stated a claim under Section 1983 for violation of his Equal Protection rights and under Section 1981 for violation of equal benefit of the laws)).

■ Section 1981 claims, like those under the Equal Protection Clause, must be based on intentional conduct. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania United Engineers & Constructors, Inc.*, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

For the same reason that plaintiff's claim under Section 1983 for violation of the equal protection clause fails, plaintiff's claim under Section 1981 fails. Plaintiff does not offer evidence which would create a genuine issue of material fact as to the existence of any intentional discriminatory conduct by Lt. Shore, or even make a minimal showing that Lt. Shore treated plaintiff differently than others who were similarly situated to him. *See generally Kahari v. Quebecor World*, 2003 WL 21782626, at *4 (S.D.N.Y. Aug.1, 2003) (no genuine issue of material fact that plaintiff was treated differently than similarly situated non-minorities when plaintiff failed to offer anything more than his own conclusory statements in favor of his allegations).

### III. Section 1983 Claim Based on the Fourth Amendment

Plaintiff alleges that Lt. Shore violated his rights under the Fourth Amendment.

Plaintiff's theory of liability is based on the Second Circuit's decision in *Lauro*

*v.Charles,* 219 F.3d 202 (2d Cir.2000) and the subsequently decided *Lyde v. New York City,* 145 F.Supp.2d 350 (S.D.N.Y. 2001). Because plaintiff's arguments are dependant on analogies to the facts and reasoning of those decisions, I will review *Lauro* and *Lyde* before addressing plaintiff's claims.

In *Lauro,* the Second Circuit held that a suspect's constitutional rights were abridged, in violation of Section 1983 and the Fourth Amendment, when the police staged a photo opportunity for the media by removing an arrested individual from jail, handcuffing him, walking him outside the station house and into an unmarked police car, driving him around the block, and walking him back into the station house. *Lauro,* 219 F.3d at 204. The *Lauro* Court recognized that it is a widespread police practice in New York City to walk a suspect in front of the press so he can be photographed or filmed -a practice popularly known as a "perp walk." *Id.* at 203. The Court noted that there are several varieties of perp walks, and that the plaintiff in the case before them was subjected to a "staged perp walk," because it was a fictitious event designed to provide a media opportunity (the plaintiff having already arrived at the station and been booked). *Id.* at 204.

The *Lauro* court limited its analysis, and its holding, to the question of whether a staged perp walk, which served no law enforcement purpose but was conducted solely for the benefit of the press, violated an arrested's rights under the Fourth Amendment. *Id.* at 203, 213. The Court explained that the Fourth Amendment re-

quires reasonableness not only in initial searches and seizures, but also in the manner and scope of searches and seizures that are carried out. *Id.* at 211. The Court concluded that the staged perp walk at issue exacerbated the plaintiff's initial (lawful) seizure in a manner that was not reasonable in light of legitimate law enforcement purposes because it invaded the plaintiff's privacy to no purpose. *Id.* at 213. The Court stated that "[e]ven assuming that there is a legitimate state interest in accurate reporting of police activity, that interest is not well served by an inherently fictional dramatization of an event that transpired hours earlier." *Id.* at 212. Nonetheless, no liability attached to the defendant officers under the doctrine of qualified immunity. *Id.* at 214.

A different type of "perp walk" was challenged in *Lyde.* There, plaintiff alleged that he was instructed by a police officer to stand on the steps of the police precinct and pull a jacket over his head while a news camera videotaped him. *Lyde,* 145 F.Supp.2d 350, 352. Noting in passing that the Second Circuit had not declared all perp walks unconstitutional (but declining to opine on the constitutionality of this particular one), the district court granted the motion to dismiss the individual officer on qualified immunity grounds, because the perp walk in question pre-dated the Circuit's decision in *Lauro.* The district court declined to dismiss the complaint against New York City, but only because perp walks were alleged to be an established custom of the NYPD. *Id* at 355.

Here, plaintiff does not allege in his complaint that the initial seizure of his identification card was illegal.[4] Rather,

---

**4.** Plaintiff does argue, in response to Defendants' 56.1 statement, that Lt. Shore determined that the identification card was not valid without sufficient foundation, and suggests that this determination of invalidity might not be accurate. Defendants respond in their reply memoranda with detailed argu-

ments about the characteristics of and procedures regarding international driver identification cards. But plaintiff neither alleges in his complaint that the initial seizure was unlawful nor advances legal arguments in his opposition memoranda based on an allegedly

plaintiff claims that his rights under the Fourth Amendment and Fourteenth Amendment were violated when Lt. Shore unreasonably aggravated the privacy intrusion caused by the initial seizure in January 2001 by providing it to the press in August 2001. (Pltf.12(b)(6) Mem., 9–10.) Alternatively, plaintiff argues that providing his photo to the press in August was itself an "unreasonable seizure." *Id.*

The Fourth Amendment aspect of plaintiff's claim is based on a direct analogy to a "perp walk." Plaintiff argues that, even if the race element of his claim were removed, there would be "no basis for distinguishing the handing over of plaintiff's photo ID card from the perp walks in *Lauro* and *Lyde* [because] the nature of the intrusion is identical: the unreasonable extension of a seizure for the non-police purpose of providing the news media with a photo opportunity." *Id.* at 9.

 I disagree with plaintiff's contention that the alleged police conduct in the instant case is of an "identical" nature to the intrusion caused by a staged perp walk. Plaintiff incorrectly characterizes *Lauro* as invalidating the extension of a seizure for "the non-police purpose of providing the news media with a photo opportunity." Actually, the *Lauro* Court's holding was quite limited—limited to the circumstance in which an arrestee was physically removed from his cell, handcuffed, led out of the police station and into a car, driven around the block, and led back into the station, solely to recreate his arrest for the media, which had managed to miss the real thing. That exacerbated the initial seizure of his person for no legitimate police purpose. Indeed, one could argue that the staged perp walk undermined good police practice, since removing the plaintiff arrested from his cell and from the station provid-

ed an unnecessary opportunity for mischief.

Plaintiff is clearly incorrect in claiming that *Lauro* (and *Lyde* ) hold that it is an unreasonable extension of a seizure "to provide the news media with a photo opportunity." (Pltf.12(b)(6) Mem., 9.) The Second Circuit did not address that issue. *Lauro*, 219 F.3d at 213. But, as plaintiff recognizes, this Court *has* addressed it, and has specifically found that public reporting about police activity serves a legitimate law enforcement purpose—even when police advise the media about events that by their nature become photo opportunities. (Pltf.12(b)(6) Mem., at 11) (citing *Caldarola v. County of Westchester*, 142 F.Supp.2d 431, 440 (S.D.N.Y.2001)). It simply does not violate the Fourth Amendment for the police to assist the media.

Moreover, while plaintiff strenuously argues that the publication of his photograph could not be justified by a "legitimate law enforcement justification," because there was no legitimate justification for the police to assist the media in publicizing a fictional event (i.e., plaintiff's arrest for shoplifting at Woodbury Commons), plaintiff fails to offer evidence to support his theory that Lt. Shore intentionally assisted the Times Herald Record in incorrectly reporting that he was arrested for shoplifting. Plaintiff claims that the police knowingly participated in "creating the public misperception that a certain person committed a particular crime or belongs to a criminal gang when they h[ad] no reason to believe that this is so." *Id.* But this is conclusory and, as I have already determined, plaintiff points to no evidence that would create a genuine issue of material fact to support his conclusion.

Thus, despite plaintiff's general legal argument that the conduct he alleges is anal-

illegal initial seizure. So all of this is an

irrelevant side-show.

ogous to a perp walk, plaintiff is unable to establish that "there [is] no basis for distinguishing the handing over of plaintiff's photo ID card from the perp walks in *Lauro* and *Lyde*." *Id.* at 9.

Finally, there is a clear factual distinction between the physical seizure and manipulation of a person to create a fictionalized media event and the provision of a lawfully seized identification card to the media for use in a story. I am aware of no case that applies the rationale in *Lauro* regarding "perp walks" to an event that can in no way be described as "staged." I am unwilling to extend the reasoning of *Lauro* to the instant case.

## IV. Section 1983 Claim Based on Violation of the Due Process Clause of the Fourteenth Amendment

Finally, plaintiff claims that Lt. Shore's conduct violated his right to due process of law under the Fourteenth Amendment. (Cmplt. ¶ 30.)

■■■■ Defendants point out that plaintiff neither alleges nor provides evidence of any tangible injury resulting from the alleged violation. (Defendants' Memorandum in Support of Defendants' Motion to Dismiss ("Def.12(b)(6) Mem."), p. 5–7; Defendants' Memorandum in Further Support of Defendants' Motion to Dismiss ("Def. 56 Mem."), p. 6–7.) It has been settled since the United States Supreme Court decided *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) that the stigma associated with defamation does not, without more, give rise to a Fourteenth Amendment violation; defamation does not work a constitutional injury unless it causes the plaintiff to be deprived of a non-reputational liberty or property interest without due process of law—often referred to as the "stigma-plus" requirement.[5]

Plaintiff does not dispute defendants' repeated arguments regarding his failure to meet the "stigma-plus" requirement of *Paul*. But plaintiff argues that his *substantive* due process rights were violated because the seizure of his ID card was a violation of his privacy so severe that it "'shock[s] the conscience' within the meaning of the Due Process Clause." (Pltf.12(b)(6) Mem., 12.)

■■■ Plaintiff's theory that his substantive right to privacy was violated is not well explained in his memoranda. If I understand it correctly, plaintiff argues that in *Lauro v. Charles*, the Second Circuit declined to consider whether perp walks violate the Due Process Clause, and he suggests that this court tackle that issue on these facts, arguing that the "exacerbating factors" set forth in his complaint make out a substantive due process claim. (Pltf.12(b)(6) Mem., 12.) Since I concluded that the provision of plaintiff's identification card to the media was not the equivalent of a fictitious "perp walk," I

---

**5.** Defendants advance their argument under *Paul v. Davis*—that plaintiff fails to plead or establish a "stigma-plus" injury—to refute plaintiff's equal protection claim. But the *Paul* Court was considering a claim brought under the due process clause. *Paul*, 424 U.S. at 702, 96 S.Ct. 1155. And, as plaintiff points out, equal protection claims under the Fourteenth Amendment are distinct from due process claims under the Fourteenth Amendment. *See Harris v. Harvey*, 605 F.2d 330, 338 (7th Cir.1979) *cert. denied* 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980) (citing cases from the Fourth, Fifth, Seventh, Eighth and Ninth Circuits in recognizing an equal protection claim against a police officer under Section 1983; distinguishing *Paul* as a claim under the due process clause that presented no equal protection issue); *McDonald v. Village of Winnetka*, 2001 WL 477148, at *3 (N.D.Ill. May 3, 2001) (plaintiff is not required to plead "stigma-plus" pursuant to *Paul* in an equal protection claim). *Paul* is thus appropriately discussed in the context of plaintiff's due process claim, not his equal protection claim.

need not and do not tackle the Due Process question left open by *Lauro.*

Plaintiff also argues that the circumstances of his case "shock the conscience" within the meaning of the due process clause—a fact-specific claim which does not depend on a violation of plaintiff's right to privacy. As stated by the Second Circuit, "malicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience. Such acts by their very nature offend our fundamental democratic notions of fair play, ordered liberty and human decency." *Johnson v. Newburgh,* 239 F.3d 246, 252 (2d Cir.2001). The Supreme Court formulated the "shocks the conscience" test in *Rochin v. California,* when it found that the forced pumping of a suspect's stomach to obtain evidence so offended due process that it "shock[ed] the conscience." 342 U.S. 165, 172–173, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Other actions that have been held to rise to the "malicious and sadistic" level include a gym teacher violently assaulting an eighth-grade student during class (*Johnson v. Newburgh* ) and a police officer sexually assaulting and harassing a citizen during repeated visits to her work place (*Haberthur v. City of Raymore, Missouri,* 119 F.3d 720 (8th Cir.1997)). In both cases, the actions were held to violate the plaintiff's Due Process rights under the Fourteenth Amendment, and thus provided a basis for a claim under Section 1983.

By contrast, in *County of Sacramento v. Lewis,* the Supreme Court concluded that the death of a motorcycle passenger in an imprudent high speed chase did not rise to the level of "shocking the conscience" for substantive due process purposes, because the plaintiff did not allege that the Sheriff who conducted the chase had a malicious motive. 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Thus, the defen-

dants were not liable under Section 1983. *Id.* at 855, 118 S.Ct. 1708. The court explained that the due process guarantee does not provide a basis for "imposing liability whenever someone cloaked with state authority causes harm." *Id.* at 848, 118 S.Ct. 1708. Rather, the "constitutional concept of conscience shocking ... points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.*

Nothing that Lt. Shore did here shocks the conscience as a matter of law. To reiterate: he discussed, apparently truthfully, criminal activity of interest to the community in the press; he provided his racially-neutral collection of false identification cards to the reporters, without intimating that they were all seized from shoplifters; he represented that they were exemplars of false identification cards; and he permitted the reporters to photograph them. There is no evidence of the kind of malicious, deliberate behavior that is required to sustain a claim under this highly disfavored theory.

## V. Monell Liability

■ Plaintiff alleges that "[e]ach and all of the acts of the defendants Shore and Doe were performed by them in their official and individual capacities under the color and pretense of the statutes, ordinances, regulations, customs, and usages of the State of New York and under their authority as officers of the Town of Woodbury Police Department." (Cmplt.¶ 6.) In order to prevail against the Town of Woodbury under either Section 1983 or Section 1981, the plaintiff must prove that the Officer(s) who deprived him of his rights were acting according to a Town of Woodbury policy or custom. *Monell v. Department of Social Servs. of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (Section 1983 liability);

*Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (municipal liability for the officer's violations under Section 1981 must be found under Section 1983, and must meet the requirements of *Monell* ); *see also, Philippeaux v. North Central Bronx Hospital,* 871 F.Supp. 640, 655–656 (S.D.N.Y.1994) (examining the holdings of *Monell* and *Jett* in the context of Section 1981, and concluding that to assert a Section 1981 claim against municipal entities plaintiff must allege a violation of Section 1983 and meet the requirements of *Monell* ).

■ Plaintiff did not survive summary judgment on any of his Section 1983 or Section 1981 claims against the individual police defendant, so he can not prevail against the Town of Woodbury. Moreover, I note that plaintiff failed to provide any evidence regarding any relevant practices, policies, or customs of the Town of Woodbury police department, so even if summary judgment had not been granted dismissing the federal claims against Lt. Shore, I would dismiss the *Monell* claims.

**VI. Qualified Immunity**

Because Lt. Shore is entitled to judgment as a matter of law on the ground that he did not violate plaintiff's constitutional rights, the doctrine of qualified immunity is inapplicable. *See Stephenson v. Doe,* 332 F.3d 68, 76–77 (2d Cir.2003) (discussing the doctrine of qualified immunity and reiterating that qualified immunity is an affirmative defense).

**VII. Plaintiff's State Law Claims**

I decline to exercise supplemental jurisdiction over plaintiff's New York State common law claims of defamation, negligence and intentional infliction of mental distress. 28 U.S.C. § 1367(c)(3). They are dismissed without prejudice.

This constitutes the decision and order of the Court.

The clerk of the court is directed to enter judgment for defendants and to close the case.